# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| | |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br><br>ESTEBAN SANCHEZ-HERNANDEZ,<br>JULIO ROMERO-ZAMORA, and<br>MIGUEL GUZMAN-TORRES,<br>Defendants | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br><br>12-<br><br>12 - 06 29M<br><br>FILED<br>CLERK, U.S. DISTRICT COURT<br>MAR 2 3 2012<br>CENTRAL DISTRICT OF CALIFORNIA<br>DEPUTY |

Complaint for violation of Title 8, United States Code, Sections 1324(a)(1)(A)(v)(I)

| NAME OF MAGISTRATE JUDGE<br><br>HON. MARGARET A. NAGLE | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br><br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br><br>March 21, 2012 | PLACE OF OFFENSE<br><br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

On or about March 22, 2012, in Los Angeles County, within the Central District of California, ESTEBAN SANCHEZ-HERNANDEZ, JULIO ROMERO-ZAMORA, and MIGUEL GUZMAN-TORRES brought to the United States certain aliens, including R.P.P. and A.G.I., knowing that they were aliens, and did so at a place other than a designated port of entry.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br><br>Jeffrey S. Bosket   /s/ |
|---|---|
| | OFFICIAL TITLE<br>Task Force Officer<br>Homeland Security Investigations-Immigration Customs Enforcement |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1)<br><br>HON. MARGARET A. NAGLE<br><br>*Margaret A. Nagle* | DATE<br><br>3/23/12 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.

AUSA: Robyn K. Bacon          REC: [DETENTION]

## AFFIDAVIT

I, Jeffrey S. Bosket, being duly sworn, declare and state:

## INTRODUCTION

1.     I am a Deputy Sheriff with the Los Angeles County Sheriff's Department ("LASD") and have been so employed for the past sixteen years.  I am currently assigned to the Los Angeles Border Enforcement Security Task Force ("LA BEST") in San Pedro, California as a Task Force Officer ("TFO"). With LA Best, I am a Narcotics Detective working in conjunction with Homeland Security Investigations ("HSI") Immigration and Customs Enforcement ("ICE"). As such, I am empowered by law to conduct investigations of, and to make arrests for, immigration and drug offenses.

2.     During the course of my assignment to LA BEST, I have participated in the investigation of cases relating to narcotics trafficking and human smuggling.  During this assignment, I have acquired knowledge and experience through criminal investigation support and enforcement actions relating to the flow of undocumented aliens utilizing the maritime environment.  In addition, as part of my training and experience as a member of LA BEST, I am also familiar with the immigration laws of the United States.  I have received training in immigration law, and I have participated in investigations involving violations of the Immigration and Naturalization Act.  During such training, I have been instructed on various aspects of conducting alien smuggling

1

investigations.  I have also assisted in numerous cases and spoken to many law enforcement officers who are well versed in conducting alien smuggling investigations.  I have also received training in the areas of arrest procedures, the execution of searches and seizures, and various other criminal laws and legal procedures.

3.    This affidavit does not purport to set forth all my knowledge of, or investigation into, this matter.  All figures, times, and calculations set forth herein are approximate.  This affidavit sets forth only the facts necessary to establish probable cause for the complaint.

## PURPOSE OF THE AFFIDAVIT

4.    This affidavit is made in support of a criminal complaint and arrest warrant for Esteban SANCHEZ-Hernandez ("SANCHEZ"), Julio ROMERO-Zamora ("ROMERO") and Miguel GUZMAN-Torres ("GUZMAN") for violations of Title 8, United States Code, Section 1324(a)(1)(A)(v)(I): Conspiracy to Bring Illegal Aliens to the United States.

5.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other law enforcement agents and investigators.  Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by a CBP officer or another law enforcement officer who

had either direct or hearsay knowledge of the statement, to whom
I have spoken, or whose report(s) I have reviewed.

**PROBABLE CAUSE**

<u>Summary</u>

6.    On March 21, 2012 at approximately 6:45 a.m., El
Segundo Police Officers, Manhattan Beach Police Officers, LA BEST
agents and United States Border Patrol ("USBP") officers found
twenty individuals on the beach adjacent to the NRG Power Plant
located at 301 Vista Del Mar, El Segundo, California.  Witnesses
saw a boat (specifically a panga boat) arrive and video footage
from a nearby factory security camera confirmed that the boat
landed and that one of the aliens, ROMERO, was directing the
aliens once they arrived onshore.  Through investigation and
interviews, agents determined that all twenty individuals were
illegal aliens who had just arrived from Mexico by boat.

7.    Four individuals identified SANCHEZ, ROMERO and/or
GUZMAN as people who had brought the aliens from Mexico to the
United States.  SANCHEZ, ROMERO and GUZMAN confessed that they
smuggled the other aliens to the United States.  SANCHEZ admitted
that he was the captain of the panga boat.  ROMERO admitted that
he was responsible for radio communications on the boat. GUZMAN
admitted that he was the boat navigator.

3

## Background

8.    Based on my training and experience as an HSI/ICE TFO,
I am aware that alien smuggling operations typically operate as
follows:

a.    Alien smugglers who intend to bring aliens into
the United States illegally bring smuggled aliens to areas in
Mexico near the United States-Mexico border.   Alien smugglers
will often bring aliens into the United States by boat, often
using a style of fishing boat known as a "panga."

b.    The laws of the United States require that the
aliens present themselves for inspection and identification at
official United States Border checkpoints, located in such places
as Temecula, San Clemente, and Indio, upon entry into this
country.   Smuggled aliens do not present themselves for
inspection.   Instead, smuggled aliens are concealed within boats
in order to circumvent official United States Border checkpoints.

c.    After surreptitiously crossing the United States-
Mexico border by boat, smuggled aliens are dropped off along the
California coastline with smuggler guides who will contact other
smugglers already in California.   The smuggled aliens are then
transferred to other vehicles or are transported to drop-houses
in areas like the Inland Empire or the greater Los Angeles,
California area.

4

d.    The alien smugglers hold the smuggled aliens at these drop-houses until their relatives and/or friends pay the alien smugglers a fee for their release.  After the smuggling fees are paid, arrangements are made for the delivery of the smuggled aliens to their friends or relatives.

e.    Smugglers communicate frequently with one another and the friends or relatives of the smuggled aliens primarily through the use of cell phones.

**Panga Boat Lands in El Segundo**

9.    On March 21, 2012, I reviewed an El Segundo Police Department report regarding the discovery of a "panga" boat on the beach in El Segundo.  From that report, I learned the following:

a.    On March 21, 2012, at approximately 6:45 a.m., El Segundo Police Department (ESPD) received a 911 transfer call from the California Highway Patrol (CHP).  The 911 caller, who was later identified as witness C.M., indicated that a boat was beached on Grand Beach, in front of the NRG Power Plant in El Segundo and that multiple people had exited the boat and were walking to the bike trail.  The caller also indicated that she believed the people in question were illegal aliens.

b.    ESPD dispatched officers to Grand Beach.  Officer Park McAllister was the first to arrive to the location.  Upon arrival, Officer McAllister observed a white Panga-style boat

5

with an outboard motor at rest on the shoreline directly west of the power plant.  Officer McAllister saw approximately 15-20 subjects running in various directions from the vicinity of where the boat was located.  Officer McAllister ordered the subjects to stop in English and Spanish; however, most of them continued to flee the area.  Officer McAllister was able to detain four individuals on the beach and set up a containment area.

     c.   As other officers from ESPD and Manhattan Beach Police Department (MBPD) arrived, they began to detain subjects who were walking around in the area in order to determine whether they were attempting to enter the United States illegally. Several subjects were found hiding under large rocks along the break wall and they were also detained.  In total, ESPD and MBPD officers detained a total of 20 subjects – 19 adults and one juvenile.  The officers then thoroughly checked the area for further individuals.  They did not locate any.

     d.   Around the same time, ESPD Officer Thomas Jones interviewed R.T., who works at the NRG power plant as an electrician.  R.T. was at work that morning, had seen the boat land and called 911 to report it.  R.T. told Officer Jones that he observed the panga boat circling the area approximately 75-100 yards offshore, ten minutes before it came to ashore.  Once the vessel came ashore, R.T. saw approximately 15-20 people run from

the boat in various directions.  According to R.T., soon after he saw people running from the boat, the police arrived.

10.   ESPD officers notified the US Border Patrol (USBP) and HSI/ICE.  ESPD officers then transported all of the detained subjects to ESPD.  At approximately 9:00 a.m., all twenty subjects were administratively arrested and transported back to the CBP Border Patrol Station in San Clemente, California for immigration processing.  At the CBP Border Patrol Station in San Clemente, California, all 20 subjects were fingerprinted and their biographical information was entered into several DHS databases. This investigation confirmed that all 20 subjects were foreign citizens and nationals without lawful permission to enter the United States.

11.   I reviewed various reports completed after the interviews with the 20 aliens detained on March 21, 2012 and I spoke to many of the agents and TFOs that conducted the interviews.  I learned that 17 of the 20 aliens indicated that they originated their voyage in Mexico and 15 of the 20 aliens said that they made some type of arrangements with a person in Mexico to pay between $2,000 and $8,500 in order to be smuggled into the U.S.  Additionally, several of the people that were interviewed indicated that they were charged an additional 1,000 pesos for the costs of fuel and a life vest for they voyage. I learned from agents and TFOs who investigated the initial boat

landing site, that a total of fifteen (15) life jackets were
recovered.

12. I have also reviewed photographs that were taken in El
Segundo by ESPD, MBPD and LA BEST agents as part of their initial
investigation. During the inspection of those pictures, I
observed various items that, based on my training and experience
and my consultation with other members of LA BEST, I believe
indicate that the panga originated in Mexico. Specifically, I
saw pictures of the following:

a. A plastic grocery bag with "MÁS LUCHONA QUE
NUNCAI" written on it. I learned from speaking to Spanish
speaking agents that bags of this kind are used as grocery bags
at grocery stores located in Mexico.

b. Several food items located on the vessel. Upon
closer inspection of these items, I observed that one of them was
a bag of chips ("Pake Taxo"), on the back of which was printed
"Hecho En México." I know from my own experience and from
conferring with Spanish speaking agents that this means "Made in
Mexico." I also observed a roll of crackers and on the rear of
the packaging was a telephone number to the company. I attempted
to call this number and learned that it was a company not located
within the US.

c. A "Ritchie Explorer Compass" still inside of the
original packaging. On the top of the package, I observed a

8

sticker with a bar code imprinted on it.  This sticker appeared to have been placed on the package after the item was purchased from the manufacturer and this sticker indicated that it was sold from a location in Tijuana, Mexico.

       d.   Several boxes containing spark plugs.  On the outside of one of the boxes, I observed an after-market sticker affixed to the box.  This sticker appeared to have been placed on the box by the company who sold the spark plug.  This sticker was printed with the following:  "54030, Tlalnepantla, Edo. De México."

       e.   One of the blue gas cans located on the panga that had a shipping sticker affixed to the exterior.  The sticker indicated that this can was shipped to a destination located in Tijuana, BC.

13.  On March 22, 2012, SA Walker went to the NRG power plant and interviewed R.T.  R.T. informed SA Walker that the power plant is equipped with a video surveillance system and was recording and monitoring the event from March 21, 2012.  R.T. informed SA Walker that, after the boat had come ashore, the cameras were directed to that area of the beach and were able to capture a portion of the event unfolding.

14.  SA Walker watched the video footage from the NRG power plant together.  During the video, I was able to see numerous people running along the bike path and the beach.  I was also

able to see that one of the individuals carried a clear plastic bag that appeared to contain clothing. The bag had handles and look as though it could be sealed to keep water out.

15. Additionally, I observed one male walking in the view of the camera. He appeared to be talking on a cellular telephone and he was carrying a white bag. At one point during the video I noticed that the male was running in a direction and appeared to have several people following behind him.

16. During the booking process, I observed a white heavy cloth bag, which contained clothing, personal hygiene items and two cellular telephones which were inside of a condom. In order to ensure that all the parties in custody could account for their property, I asked ROMERO if the white bag was his. ROMERO told to me that the white bag did belong to him.

17. On March 22, 2012, SA Walker also informed me that he was able to contact the witness, C.M., who placed the other 911 phone call about the boat. SA Walker told me that C.M. told him the following:

a. C.M. said that she was jogging on a trail between the beach and the power plant when she observed a vessel just off shore. She said that this vessel looked suspicious in nature. As she was watching the vessel, she saw it run aground on the beach.

10

b.   Upon landing on the beach, C.M. stated that she first saw three bodies inside of the boat.  Then, as the boat came to shore, she observed multiple people begin to jump out of the vessel.  C.M. said that, based on what she saw, she knew that this boat possibly contained illegal aliens and that she needed to call the police immediately.

c.   At this time, several people riding bikes approached her on the trail.  She asked if one of them had a cell phone she could use to call the police.  One of the parties gave her a cell phone and C.M. placed the 911 phone call.  C.M. added that, during her observations, she remembered seeing approximately two people turn the boat to place the bow of the vessel out to sea, in what appeared to her to be attempt to flee back to open waters.

**Material Witness Interviews**

18.  On March 21, 2012, LA BEST and CBP agents interviewed the twenty aliens at the San Clemente Border Patrol Station. During the interviews, agents and TFOs used a photo array to identify potential suspects.  The photo array contained photos of all twenty aliens found on the coast that morning.

19.  At approximately 5:57 p.m., material witness R.P.P. was interviewed and provided a statement to USBP Agent Alvaro Rodriguez and Supervisory Border Patrol Agent Yvonee Sencio in the Spanish language.  Agent Rodriguez is fluent in the Spanish

11

language and conducted the interview in Spanish.  I reviewed a summary of this interview and learned the following:

    a.    R.P.P. was born in Guadalajara, Jalisco, Mexico and did not have any immigration documents that would allow him to be or remain in the United States legally.  According to R.P.P., his uncle in Guadalajara made arrangements with an unidentified smuggler for R.P.P. to come to the United States by boat for $7,000.  R.P.P. stated that his intended destination was Los Angeles, California and added that he was also charged an additional 800 pesos for the use of a life vest during the trip.

    b.    R.P.P. said that while he was waiting for the trip, the smugglers housed him at the Hotel El in Tijuana, Baja California, Mexico.  On or about March 20, 2012, R.P.P. stated that the unknown smuggler sent a "Taxi Libre" to drive him to Ensenada, Baja California, Mexico and drop him off at the "Mercado Negro," which R.P.P. described as a park near the Ensenada Harbor where there is a large Mexican flag flying.

    c.    R.P.P. said that, at approximately 7:30 p.m., he and other smuggled aliens boarded a fishing boat in the harbor. R.P.P. said that after traveling for about a half hour on the fishing boat, he and the other smuggled aliens were transferred to a panga boat that was waiting for them at sea.  According to R.P.P., this panga was the same panga in which he was apprehended.

d.   R.P.P. said that on the panga he heard one of the smugglers, whom he later identified as ROMERO, talking on a radio.  According to R.P.P., ROMERO appeared to be attempting to coordinate their panga-landing site with smugglers on shore waiting to pick them up at the beach.  R.P.P. further stated that he believed that the panga captain, whom he later identified as SANCHEZ, was lost because ROMERO was repeatedly trying to inform the smugglers waiting near the beach about their location. R.P.P. said that upon landing on the beach he saw that ROMERO, SANCHEZ and another individual, whom he later identified as GUZMAN, remained behind and were attempting to push the panga away from the beach and back into the water.  R.P.P. said that moments later they were all apprehended on the beach.

e.   Agent Rodriguez presented R.P.P. with the photo array and R.P.P. identified the person depicted in photograph number 17 as the smuggler he observed communicating and coordinating with the smugglers via radio.  Photograph number 17 depicts ROMERO.

f.   Using the same photo array, R.P.P. identified the person depicted in photograph number 18 as the smuggler he observed acting as the panga captain or driver.  Photograph number 18 depicts SANCHEZ.

g.   Using the same photo array, R.P.P. identified the person depicted in photograph number 15 as the smuggler he

13

observed stay behind and attempt to push the panga back into the sea.  Photograph number 15 depicts GUZMAN.

h.    R.P.P. added that he believes that the three defendants know each other well because during the trip, GUZMAN and ROMERO sat next to SANCHEZ on the panga and repeatedly referred to SANCHEZ as "Capitan" and "Comandante."   R.P.P. also said that during the trip he was not provided with any food or water and feared for his life because SANCHEZ was driving the panga very fast in what he considered to be rough water.

20.  At approximately 11:34 p.m., material witness A.G.I. was interviewed and provided a statement to USBP Agents Alvaro Rodriguez and Hermenegildo Martinez in the Spanish language. I reviewed a summary of this interview and learned the following:

a.    A.G.I. stated that he is a Mexican citizen, he was born in Nayarit, Mexico and that he did not have any immigration documents that would allow him to be or remain in the United States legally.  A.G.I. said he made arrangements with a smuggler called Carlos for transportation to the United States for $8,000.  A.G.I. stated that his intended destination was Los Angeles, California.

b.    A.G.I. said he stayed with his family in Tijuana Baja California, Mexico waiting for Carlos to call him.  On March 20, 2012, A.G.I. said he took a bus to Ensenada and then a taxi

14

to a park near the Ensenada Harbor where there is a large Mexican flag flying.

c.  A.G.I. said that at approximately 7:30 p.m., he and the other smuggled aliens boarded a fishing boat in the harbor.  According to A.G.I., after traveling for about a half hour, he and the rest of the smuggled aliens were transferred to a panga that was waiting at sea.  A.G.I. stated that the panga was the same panga in which he was apprehended.

d.  A.G.I. said that during the panga trip, he heard someone on the back of the panga say that they missed their landing spot.  A.G.I. said he heard them say that they were supposed to land in Long Beach or San Pedro.  According to A.G.I., he heard a radio conversation between the smugglers and someone on shore asking the smugglers where they were because the waiting smugglers onshore could not see them.  A.G.I. said the boat driver decided to land the boat anyway.

e.  A.G.I. said that, upon landing on the beach, he saw someone he later identified as ROMERO giving everyone instruction about where to go.  According to A.G.I., ROMERO was also asking smuggled aliens to help push the panga back into the water.  Moments later they were all apprehended on the beach.

f.  Agent Rodriguez presented A.G.I. with the photo array.  A.G.I. identified the person depicted in photograph number 17 as the smuggler he observed giving orders at the beach

15

and the person asking for help pushing the panga back into the water.   Photograph number 17 depicts ROMERO.

g.   Using the same photo array, A.G.I. identified the person depicted in photograph number 15 as the smuggler he observed acting as the panga captain or driver.   Photograph number 15 depicts GUZMAN.

h.   Using the same photo array, A.G.I. identified the person depicted in photograph number 18 as the smuggler he observed next to the panga driver. Photograph number 18 depicts SANCHEZ.

i.   A.G.I. added that during the trip he was not provided with any food or water and feared for his life.

21.   At approximately 1:33 p.m., material witness L.C.S. was interviewed and provided a statement to Agent Martinez and Special Agent Simons in the Spanish language.   I reviewed a summary of this interview and learned the following:

a.   L.C.S. is a Mexican citizen who was born in Oaxaca, Mexico and now resides in Ensenada.   L.C.S. stated that she does not have any immigration documents that would allow her to be or remain in the United States legally.   Her husband, who lives in Palmdale, CA, made arrangements with a smuggler to have her smuggled via Panga boat into the United States for $7,000. Her husband also paid the smugglers 1,000 pesos for her costs during the trip, including fuel and a life jacket.   During the

interview, she provided agents with telephone number for her husband. Agents called her husband and allowed her to speak with him. Her husband confirmed making the smuggling arrangement with an individual known as "Nene" to bring her to Los Angeles for $7,000.

b.   On March 20, 2012, L.C.S. said that she and three males were taken by an unidentified man to the Ensenada Harbor where the "big flag" is. There, they were told to board a fishing boat, captained by an unknown individual. L.C.S. said that the fishing boat traveled for approximately 15 minutes out into the ocean before she and the other aliens were transferred from the fishing boat to the Panga boat. L.C.S. said that they traveled on the panga boat throughout the night until they landed on the beach in El Segundo. L.C.S. claimed that she and the other three females on the Panga boat sat in the section directly in front of the boat's steering column and that she sat directly in front of the Captain. L.C.S. claimed that she was provided with the life jacket she had paid for, but the smugglers never provided her or the other aliens with any food or water during the trip. L.C.S. stated that when they landed on the beach, she and the other smuggled aliens followed their guide, who was carrying a white duffel style bag in his hand.

c.   L.C.S. was presented with the photo array, but she did not positively identify anyone as one of the smugglers.

17

L.C.S. pointed to the person depicted in photograph number 17 and identified him as a possible smuggler and then changed her answer by pointing to the person depicted in photograph number 19 and stated that she was not sure.  L.C.S. stated that she was told to look forward for the entire trip and did get a very good look at the smugglers.  Photograph number 17 depicts ROMERO. Photograph number 19 depicts smuggled alien A.P.M.

22.  At approximately 5:54 p.m., material witness M.R.C. was interviewed and provided a statement to USBP Agents Joel Lopez and Julian Velardes in the Spanish language.  I reviewed a summary of this interview and learned the following:

a.  M.R.C. stated that he was a citizen of El Salvador and admitted that he did not possess any immigration documents that would allow him to be, or remain, in the United States legally.  M.R.C. stated he was previously deported after being arrested for domestic violence.

b.  M.R.C. said that he made arrangements to be smuggled into the United States via panga for $8,000, which he was to pay after he arrived in the United States.  M.R.C. said he was picked up by an unknown man in Tijuana and transported to Ensenada where, at approximately 7:30 P.M., he boarded a boat. M.R.C. stated the boat drove for approximately 40 minutes west and then he and the other aliens were told to board a panga.

M.R.C. said that it was the same panga in which he and the other aliens landed in the United States.

      c.  M.R.C. said he believes the smugglers were lost because when they landed they had to wait for the load driver. As they waited they were apprehended by law enforcement.

      d.  M.R.C. was presented with the photo array.  He identified the person depicted in photograph number 18 as the panga "Navigator".  Photograph number 18 depicts SANCHEZ.

      e.  Using the same photo array, M.R.C. identified the person depicted in photograph number 14 as a person who he saw talking to number 18.  Photograph number 14 depicts smuggled alien J.R.P.

**Interview with Sanchez**

23.  At approximately 8:53 p.m., SANCHEZ was interviewed and advised of his Miranda rights by USBP Agents Lopez and Velardes in the Spanish language.  SANCHEZ stated that he understood his rights, waived his Miranda rights, and elected to make a statement without an attorney present. I reviewed a summary of this interview and learned the following:

      a.  SANCHEZ stated that he was a Mexican citizen who was born in Nayarit, Mexico and admitted that he did not possess any immigration documents that would allow him to be, or remain, in the United States legally.

19

b.   When questioned about the smuggling event, SANCHEZ
initially claimed that he was a smuggled alien and that he agreed
to pay the smugglers $8,000 after he arrived in the United
States.  SANCHEZ claimed that he traveled to Tijuana on March 19
where he met a smuggler named "El Pina" who drove him to the
Ensenada Harbor in Ensenada where he waited from approximately
4:00 p.m. until 8:00 p.m. to get on a boat.  SANCHEZ then claimed
that the smuggling boat did not depart so he stayed in an unknown
hotel in Ensenada until the next day when "El Pina" picked him up
and took him to the boat.  However, when confronted with the
facts of the case and told that his story was implausible,
SANCHEZ admitted that he had been lying to the Agents and agreed
to tell the truth.

c.   SANCHEZ admitted that he was driving the boat.
SANCHEZ described himself as "poor" and stated that he was a
"fisherman" from Nayarit who needed the money.  SANCHEZ claimed
that he was approached by a smuggler named "La Leche" near La
Pinita Beach in Nayarit and told that he can make money smuggling
people by boat to the United States.  SANCHEZ stated that "La
Leche" instructed him to travel to Ensenada where he was
introduced to "El Chilango," whom he described as a "fat"
Hispanic male approximately 30 years old.  SANCHEZ stated that he
was to be paid $200 per person to captain the panga to the United
States.  SANCHEZ said that "El Chilango" provided him with a GPS

prior to the smuggling event.  SANCHEZ claimed that he was
instructed to take the panga on a route to the west of Santa
Catalina Island and once past the Island he was instructed to
drive toward the mainland.  SANCHEZ said that he departed from
Ensenada at approximately 8:00 p.m. and approximately 5
kilometers off shore met with another panga to load approximately
18 - 20 fuel containers on board.  SANCHEZ then said that he then
met with a third, larger boat off shore where he picked up the
smuggled aliens.  SANCHEZ stated that he then began traveling
north and was due to arrive in the Los Angeles area at
approximately 3:00 a.m. or 4:00 a.m. where unknown smugglers
would be waiting for them.

     d.  SANCHEZ was presented with the photo array and he
identified the person depicted in photograph number 17 as the
panga "Co-Captain" and "Foot Guide."  Photograph number 17
depicts ROMERO. According to SANCHEZ, ROMERO left with SANCHEZ on
the panga from the harbor and he was to guide the smuggled aliens
to the vehicle once they landed on shore.

     e.  Using the same photo array, SANCHEZ identified the
person depicted in photograph number 15 as the "Navigator" and a
person who he knows from Nayarit.  Photograph number 15 depicts
GUZMAN.  According to SANCHEZ, GUZMAN arrived on the panga with
the smuggled aliens and was working the GPS during the panga
trip.

**Interview with ROMERO**

24.   At approximately 7:30 p.m., ROMERO was interviewed and advised of his Miranda rights by Agents Martinez and Manuel Aguirre in the Spanish language.   ROMERO stated that he understood his rights, waived his Miranda rights, and elected to make a statement without an attorney present regarding the smuggling event. I reviewed a summary of this interview and learned the following:

a.   ROMERO said he was a Mexican citizen who was born in Mazatlan, Sinaloa, Mexico.   ROMERO admitted that he did not possess any immigration documents that would allow him to be, or remain, in the United States legally.   ROMERO said that he currently resides in Tijuana with his wife and four minor children where he is employed as a taxi driver.

b.   When questioned about the smuggling event, ROMERO initially claimed that he was approached by an unidentified smuggler in Tijuana and that he paid the smuggler $3,000 for the trip.   According to ROMERO, he was taken by bus to a beach in Baja California where he boarded a panga "loaded" with people and began traveling north.   ROMERO claimed that the panga traveled all night until morning when they were arrested.   ROMERO stated that he did not care where the panga landed because he wanted an "adventure".   However, when confronted with the facts of the case, ROMERO recanted his initial statement and stated that he

22

had previously lied to investigators because "he thought he could get away with it".

       c.   ROMERO admitted that he "was involved" in the smuggling event. ROMERO said that he was picked up by the panga at a beach in Popotla, Baja California and that he was to serve as the group's foot guide. ROMERO said that his specific duties were to keep in telephone contact with an unknown smuggler in Mexico and, once the panga landed along the California coast, he was supposed to guide the smuggled aliens to a waiting Ford Expedition. ROMERO claimed that for his service he was to receive a $3,000 discount from his $6,000 smuggling fee.

       d.   ROMERO was presented with a photo array and he identified the person depicted in photograph number 18 as the panga "captain." Photograph number 18 depicts SANCHEZ.

       e.   ROMERO was presented with the same photo array and he identified the person depicted in photograph number 15 as the "Navigator." Photograph number 15 depicts GUZMAN.

**Interview with GUZMAN**

    25.  At approximately 10:25 p.m., GUZMAN was interviewed and advised of his Miranda rights by Agents Lopez and Velardes in the Spanish language. GUZMAN stated that he understood his rights, waived his Miranda rights, and elected to make a statement without an attorney present regarding the smuggling event. I reviewed a summary of this interview and learned the following:

event. I reviewed a summary of this interview and learned the
following:

      a.   GUZMAN stated that he was a Mexican citizen who
was born in Nayarit, Mexico.  GUZMAN also admitted that he did
not possess any immigration documents that would allow him to be,
or remain, in the United States legally.  GUZMAN said that he
currently resides in Tijuana.

      b.   When questioned about the smuggling event, GUZMAN
initially claimed that he was approached by an unidentified
smuggler in Nayarit who offered him an opportunity to come to the
United States at a discounted price in exchange for his help.
GUZMAN claims that he was asked to do this because of his
experience as a fisherman in Nayarit.  GUZMAN claims that he was
told that he would be smuggling a group of people into the United
States by boat and that his job would be to help the people
aboard when asked to do so by other members of the smuggling
group.  GUZMAN said that he was only going to be charged $200
dollars as a smuggling fee in exchange for his services.

      c.   GUZMAN traveled to Tijuana where he established a
residence in "Colonia Maria Matamoros."  GUZMAN claimed that he
had been living there for approximately one month before he
received a call from an unknown smuggler advising him that his
services would be needed.  GUZMAN was told to travel to Ensenada

to await further instruction.  GUZMAN claimed that he never met the smuggler in person and all communication was telephonic.

     d.    GUZMAN said that he was told to go to the harbor in Ensenada where he boarded a tourist-type boat, which he described as more luxurious than a panga.  GUZMAN stated that all the people were arrested with him today were aboard the vessel when they departed.  GUZMAN stated that they made their way out of the harbor and were met by a panga boat out in the ocean. They were told to leave the bigger vessel and climb onboard the panga.

     e.    GUZMAN stated that he operated a Global Positioning System Device (GPS) while on the panga.  He also mentioned that when the panga's fuel was low, he would assist in the refueling.  GUZMAN said they passed approximately 3 miles west the Coronado Islands at about 10 p.m.  GUZMAN then said that they passed approximately two miles west of Catalina Island at approximately 3 a.m. or 4 a.m.

     f.    GUZMAN was presented with the photo array and he identified the person depicted in photograph number 18 as the panga "Choffer" (Driver).  Photograph number 18 depicts defendant SANCHEZ.

     g.    GUZMAN was presented with the same photo array and he identified the person depicted in photograph number 17 as the person who was operating the radio and was in communication with

the subjects who were supposed to pick them up once in the United States.   Photograph number 17 depicts ROMERO.

## CONCLUSION

20.   Based upon the foregoing facts and my training and experience, I submit there is probable cause to believe that SANCHEZ, ROMERO and GUZMAN conspired and agreed with each other to bring an alien to the United States, knowing of the fact that the person was an alien, in any manner whatsoever at a place other than a designated port of entry and place other than as designated by the Commissioner, regardless of whether such alien had received prior official authorization to come to, enter, and reside in the United States and regardless of any future official action which may be taken with respect to such alien, in violation of Title 8, United States Code, Sections 1324(a)(1)(A)(v)(I).


/s/
_____
Jeffrey S. Bosket
Task Force Officer
Homeland Security Investigations /
Immigration and Customs Enforcement


Sworn to the subscribed before me
this 23rd day of March 2012

*Margaret A. Nagle*     26

MARGARET A. NAGLE
U.S. MAGISTRATE JUDGE

_____

United States Magistrate Judge