ORIGINAL

1  ANDRÉ BIROTTE, JR.
   United States Attorney
2  ROBERT E. DUGDALE
   Assistant United States Attorney
3  Chief, Criminal Division
   ROBYN K. BACON (Cal. State Bar No.: 251048)
4  Assistant United States Attorney
   General Crimes Section
5       1200 United States Courthouse
        312 North Spring Street
6       Los Angeles, California
        Telephone:  (213) 894-4667
7       Facsimile:  (213) 894-0141
        E-mail: robyn.bacon@usdoj.gov
8
   Attorneys for Plaintiff
9  United States of America

10                    UNITED STATES DISTRICT COURT

11          FOR THE CENTRAL DISTRICT OF CALIFORNIA

12

   UNITED STATES OF AMERICA,      )   No. 12-699-MJ
13                                 )
              Plaintiff,           )   GOVERNMENT'S MOTION FOR
14                                 )   DESIGNATION AND DETENTION OF
              v.                   )   MATERIAL WITNESSES WITH $5,000
15                                 )   APPEARANCE BOND WITH THIRD
   ESTEBAN SANCHEZ-HERNANDEZ,      )   PARTY AFFIDAVIT OF SURETY
16  et al.,                        )   THEREON; MEMORANDUM OF POINTS
                                   )   AND AUTHORITIES; AFFIDAVIT OF
17            Defendants.          )   JEFFREY S. BOSKET
                                   )

18

19       Plaintiff, the United States of America, by and through its

20  counsel of record, the United States of America for the Central

21  District of California, hereby moves this Court for an order to

22  detain the following persons as material witnesses in the

23  above-captioned case pursuant to Title 18, United States Code,

24  Section 3144:

25       1.   Leticia Castillo-Santoyo

26       2.   Su Hang Lee or Su Fen Xu

27       3.   Mariana Medrono-Gonzalez

28       4.   Marta Fuentes-Ramirez

5.   Oswaldo Beltran-Escalante

6.   Abel Pena-Siva

7.   Romero Guadalupe Prieto-Plascencia OR Ramiro Prieto-Placencia

8.   Asencion Grajeola-Islas

9.   Ruben Ramos-Muniz

10.   Alberto Rangel-Valencia

11.   Ricardo Rodriguez-Manzo or Jose Arias-Avalos

12.   Marlon Lopez-Castro or Manuel Renderos-Comayagua

13.   Joel Ruiz-Perez

14.   Norberto Antonez-Nora

15.   Alfonso Puentes-Mora

16.   Jose Luis Denis Rosales

The Government, moreover, moves that a $5,000 appearance bond with affidavit of surety from a responsible third party (with approval of the surety by Pre-trial Services), as well as Pre-trial Services' supervision, be ordered as to these witness. Should the presence of these people not be secured by adequate bond, it will become impracticable to secure their presence at trial by subpoena.

//

//

//

2

1     This motion is based upon the attached memorandum of points

2 and authorities, the attached affidavit of Task Force Officer

3 Jeffrey S. Bosket, the files and records of this case, and on

4 such further evidence or argument the Court may allow at the

5 hearing on this motion.

6

7 DATED: March 23, 2012            Respectfully submitted,

8                                     ANDRE BIROTTE, JR.
                                    United States Attorney

9

10                                     ROBERT E. DUGDALE
                                    Assistant United States Attorney
                                    Chief, Criminal Division

11

12

13                                     ROBYN K. BACON
                                    Assistant United States Attorney

14

15                                     Attorneys for Plaintiff
                                    United States of America

16

17

18

19

20

21

22

23

24

25

26

27

28                                  3

1    <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

2    Title 18, United States Code, Section 3144, provides that

3    where it appears by affidavit that "the testimony of a person is

4    material in a criminal proceeding," and where it is "shown that

5    it may become impracticable to secure the presence of the person

6    by subpoena," the Court may order the arrest of the person and

7    treat him in accordance with 18 U.S.C. § 3142.[1]

8    It is well settled that illegal aliens who are witnesses to

9    a crime for which a defendant is charged can be held as material

10   witnesses.  <u>See</u> <u>United States v. Verduzco-Macias</u>, 463 F.2d 105,

11   107 (9th Cir. 1972) ("The material witness is treated like a

12   person accused of a noncapital crime.").  Furthermore, the

13   government's failure to ensure the availability of an alien

14   material witness may be held to be a denial of due process.  <u>See</u>

15   <u>United States v. Tsutagawa</u>, 500 F.2d 420, 423 (9th Cir. 1974).

16   Also, as the Supreme Court held in <u>United States v.</u>

17   <u>Valenzuela-Bernal</u>, 458 U.S. 858, 873-74 (1982), the deportation

18   of a witness who could testify to matters material and favorable

19   to the defense could subject the government to sanctions.

20   Accordingly, both statute and case law make it clear that

21   when the government believes that the normal subpoena process

22   will not secure the presence of a witness to a crime, it may

23   apply to the court for conditions to be imposed on the release of

24

25       [1]  Section 3142 requires the Court to order that, pending
26   trial, the person be either (1) released on personal
     recognizance, an unsecured appearance bond, a secured appearance
27   bond, or (2) detained.  18 U.S.C. § 3142(a)(1)-(4).

28                                    1

that person, pursuant to 18 U.S.C. § 3142. Indeed, whether or not the government has requested bond, or otherwise provided economic inducement for the aliens to make themselves available at trial, has been mentioned by some courts as a factor in determining whether or not the government acted in good faith under such circumstances. <u>United States v. Seijo</u>, 595 F.2d 116, 118 (2d Cir. 1979); <u>United States v. Verduzco-Macias</u>, 463 F.2d 105, 107, n.2 (9th Cir. 1972).

The attached affidavit sets forth sufficient facts to find that the testimony of the persons detained is material to the trial of this matter in that such testimony will establish that the persons witnessed events necessary to a prosecution of the case and any suppression issues that might be raised.

It is clear that unless the presence of these persons at trial is secured by adequate bond, it may well become impracticable to secure their presence by subpoena. In <u>United States v. Hart</u>, 546 F.2d 798, 800-801 (9th Cir. 1976), the Ninth Circuit held that the government was required to use "reasonable efforts" to produce at trial material witnesses, taking into account the history and attitude of such witnesses. The court noted that the detention of material witnesses has been found appropriate in those cases where "[e]very self-interest [of the witnesses] was on the side of their fleeing the jurisdiction." <u>Id.</u> at 800.

In the present case, the alien witnesses face the possibility of imminent deportation hearings. In view of those

2

1 | proceedings, they may have reason to make themselves unavailable
2 | for trial in order to avoid deportation.  Because the witnesses
3 | may desire to avoid the compulsory process of the court, these
4 | witnesses must be designated as material witnesses and an
5 | appropriate bond must be set in order to ensure their presence at
6 | trial.

7 | In light of the above, the government moves this Court to
8 | declare that the above-named witnesses are material witnesses and
9 | to set bond on such witnesses as follows: (1) a $5,000 appearance
10 | bond secured by a third-party affidavit of surety without
11 | justification (with approval of the surety by Pre-trial
12 | Services); and (2) Pre-trial Services supervision.  It is
13 | suggested that only by such an order can a failure and
14 | frustration of justice be prevented.

3

# AFFIDAVIT

I, Jeffrey S. Bosket, being duly sworn, declare and state:

## INTRODUCTION

1.  I am a Deputy Sheriff with the Los Angeles County
Sheriff's Department ("LASD") and have been so employed for the
past sixteen years.  I am currently assigned to the Los Angeles
Border Enforcement Security Task Force ("LA BEST") in San Pedro,
California as a Task Force Officer ("TFO"). With LA Best, I am a
Narcotics Detective working in conjunction with Homeland Security
Investigations ("HSI") Immigration and Customs Enforcement
("ICE"). As such, I am empowered by law to conduct investigations
of, and to make arrests for, immigration and drug offenses.

## PURPOSE OF THE AFFIDAVIT

2.  This affidavit is made pursuant to 18 U.S.C. § 3144 and
in support of the government's motion for designation and
detention of material witnesses LETICIA CASTILLO-SANTOYO, SU HANG
LEE, aka "Su Fen Xu," MARIANA MEDRONO-GONZALEZ, MARTA FUENTES-
RAMIREZ, OSWALDO BELTRAN-ESCALANTE, ABEL PENA-SIVA, aka "Fernando
Zaragoza-Torres," ROMERO GUADALUPE PRIETO-PLASCENCIA, aka "Ramiro
Prieto-Placencia," ASENCION GRAJEOLA-ISLAS, RUBEN RAMOS-MUNIZ,
ALBERTO RANGEL-VALENCIA, RICARDO RODRIGUEZ-MANZO, aka "Jose
Arias-Avalos," MARLON LOPEZ-CASTRO, "Manuel Renderos-Comayagua,"
JOEL RUIZ-PEREZ, NORBERTO ANTONEZ-NORA, ALFONSO PUENTES-MORA,
JOSE LUIS DENIS ROSALEZ (collectively, "material witnesses") in

1

connection with a criminal complaint against Esteban Sanchez-Hernandez ("Sanchez"), Julio Cesar Romero-Zamora ("Romero"), and Miguel Angel Guzman-Torres ("Guzman") for a violation of Title 8, United States Code, Section 1324(a)(1)(A)(v)(I), Conspiracy to Bring Illegal Aliens to the United States. This affidavit is submitted solely for the purpose of establishing that the testimony of the foregoing material witnesses is material in a criminal proceeding and does not purport to set forth all of my knowledge of, or investigation into, the offense.

### PROBABLE CAUSE TO DESIGNATE MATERIAL WITNESSES

#### Summary

3.    On March 21, 2012 at approximately 6:45 a.m., El Segundo Police Officers, Manhattan Beach Police Officers, LA BEST agents and United States Border Patrol ("USBP") officers found twenty individuals on the beach adjacent to the NRG Power Plant located at 301 Vista Del Mar, El Segundo, California. Witnesses saw a boat (specifically a panga boat) arrive and video footage from a nearby factory security camera confirmed that the boat landed and that one of the aliens, Romero, was directing the aliens once they arrived onshore. Through investigation and interviews, agents determined that all twenty individuals were illegal aliens who had just arrived from Mexico by boat.

4.    Four individuals identified Sanchez, Romero and/or Guzman as people who had brought the aliens from Mexico to the

2

United States. Sanchez, Romero and Guzman confessed that they smuggled the other aliens to the United States. Sanchez admitted that he was the captain of the panga boat. Romero admitted that he was responsible for radio communications on the boat. Guzman admitted that he was the boat navigator.

**Background**

5.     Based on my training and experience as an HSI/ICE TFO, I am aware that alien smuggling operations typically operate as follows:

a.     Alien smugglers who intend to bring aliens into the United States illegally bring smuggled aliens to areas in Mexico near the United States-Mexico border. Alien smugglers will often bring aliens into the United States by boat, often using a style of fishing boat known as a "panga."

b.     The laws of the United States require that the aliens present themselves for inspection and identification at official United States Border checkpoints, located in such places as Temecula, San Clemente, and Indio, upon entry into this country. Smuggled aliens do not present themselves for inspection. Instead, smuggled aliens are concealed within boats in order to circumvent official United States Border checkpoints.

c.     After surreptitiously crossing the United States-Mexico border by boat, smuggled aliens are dropped off along the California coastline with smuggler guides who will contact other

3

smugglers already in California.  The smuggled aliens are then transferred to other vehicles or are transported to drop-houses in areas like the Inland Empire or the greater Los Angeles, California area.

d.    The alien smugglers hold the smuggled aliens at these drop-houses until their relatives and/or friends pay the alien smugglers a fee for their release.  After the smuggling fees are paid, arrangements are made for the delivery of the smuggled aliens to their friends or relatives.

e.    Smugglers communicate frequently with one another and the friends or relatives of the smuggled aliens primarily through the use of cell phones.

**Panga Boat Lands in El Segundo**

6.    On March 21, 2012, I reviewed an El Segundo Police Department report regarding the discovery of a "panga" boat on the beach in El Segundo.  From that report, I learned the following:

a.    On March 21, 2012, at approximately 6:45 a.m., El Segundo Police Department (ESPD) received a 911 transfer call from the California Highway Patrol (CHP).  The 911 caller, who was later identified as witness C.M., indicated that a boat was beached on Grand Beach, in front of the NRG Power Plant in El Segundo and that multiple people had exited the boat and were

4

walking to the bike trail.  The caller also indicated that she
believed the people in question were illegal aliens.

     b.     ESPD dispatched officers to Grand Beach.  Officer
Park McAllister was the first to arrive to the location.  Upon
arrival, Officer McAllister observed a white Panga-style boat
with an outboard motor at rest on the shoreline directly west of
the power plant.  Officer McAllister saw approximately 15-20
subjects running in various directions from the vicinity of where
the boat was located.  Officer McAllister ordered the subjects to
stop in English and Spanish; however, most of them continued to
flee the area.  Officer McAllister was able to detain four
individuals on the beach and set up a containment area.

     c.     As other officers from ESPD and Manhattan Beach
Police Department (MBPD) arrived, they began to detain subjects
who were walking around in the area in order to determine whether
they were attempting to enter the United States illegally.
Several subjects were found hiding under large rocks along the
break wall and they were also detained.  In total, ESPD and MBPD
officers detained a total of 20 subjects - 19 adults and one
juvenile.  The material witnesses were among the 19 adults
detained that morning.  The officers then thoroughly checked the
area for further individuals.  They did not locate any.

     d.     Around the same time, ESPD Officer Thomas Jones
interviewed R.T., who works at the NRG power plant as an

electrician.  R.T. was at work that morning, had seen the boat
land and called 911 to report it.  R.T. told Officer Jones that
he observed the panga boat circling the area approximately 75-100
yards offshore, ten minutes before it came to ashore.  Once the
vessel came ashore, R.T. saw approximately 15-20 people run from
the boat in various directions.  According to R.T., soon after he
saw people running from the boat, the police arrived.

7.   ESPD officers notified the US Border Patrol (USBP) and
HSI/ICE.  ESPD officers then transported all of the detained
subjects to ESPD.  At approximately 9:00 a.m., all twenty
subjects were administratively arrested and transported back to
the CBP Border Patrol Station in San Clemente, California for
immigration processing.  At the CBP Border Patrol Station in San
Clemente, California, all 20 subjects were fingerprinted and
their biographical information was entered into several DHS
databases. This investigation confirmed that all 20 subjects were
foreign citizens and nationals without lawful permission to enter
the United States.

8.   I reviewed various reports completed after the
interviews with the 20 aliens detained on March 21, 2012 and I
spoke to many of the agents and TFOs that conducted the
interviews.  I learned that 17 of the 20 aliens indicated that
they originated their voyage in Mexico and 15 of the 20 aliens
said that they made some type of arrangements with a person in

6

Mexico to pay between $2,000 and $8,500 in order to be smuggled into the U.S. Additionally, several of the people that were interviewed indicated that they were charged an additional 1,000 pesos for the costs of fuel and a life vest for they voyage. I learned from agents and TFOs who investigated the initial boat landing site, that a total of fifteen (15) life jackets were recovered.

9.   I have also reviewed photographs that were taken in El Segundo by ESPD, MBPD and LA BEST agents as part of their initial investigation. During the inspection of those pictures, I observed various items that, based on my training and experience and my consultation with other members of LA BEST, I believe indicate that the panga originated in Mexico. Specifically, I saw pictures of the following:

a.   A plastic grocery bag with "MÁS LUCHONA QUE NUNCAI" written on it. I learned from speaking to Spanish speaking agents that bags of this kind are used as grocery bags at grocery stores located in Mexico.

b.   Several food items located on the vessel. Upon closer inspection of these items, I observed that one of them was a bag of chips ("Pake Taxo"), on the back of which was printed "Hecho En México." I know from my own experience and from conferring with Spanish speaking agents that this means "Made in Mexico." I also observed a roll of crackers and on the rear of

7

the packaging was a telephone number to the company. I attempted
to call this number and learned that it was a company not located
within the US.

c. A "Ritchie Explorer Compass" still inside of the
original packaging. On the top of the package, I observed a
sticker with a bar code imprinted on it. This sticker appeared
to have been placed on the package after the item was purchased
from the manufacturer and this sticker indicated that it was sold
from a location in Tijuana, Mexico.

d. Several boxes containing spark plugs. On the
outside of one of the boxes, I observed an after-market sticker
affixed to the box. This sticker appeared to have been placed on
the box by the company who sold the spark plug. This sticker was
printed with the following: "54030, Tlalnepantla, Edo. De
México."

e. One of the blue gas cans located on the panga that
had a shipping sticker affixed to the exterior. The sticker
indicated that this can was shipped to a destination located in
Tijuana, BC.

10. On March 22, 2012, SA Walker went to the NRG power
plant and interviewed R.T. R.T. informed SA Walker that the
power plant is equipped with a video surveillance system and was
recording and monitoring the event from March 21, 2012. R.T.
informed SA Walker that, after the boat had come ashore, the

8

cameras were directed to that area of the beach and were able to capture a portion of the event unfolding.

11.   SA Walker watched the video footage from the NRG power plant together.   During the video, I was able to see numerous people running along the bike path and the beach.   I was also able to see that one of the individuals carried a clear plastic bag that appeared to contain clothing.   The bag had handles and look as though it could be sealed to keep water out.

12.   Additionally, I observed one male walking in the view of the camera.   He appeared to be talking on a cellular telephone and he was carrying a white bag.   At one point during the video I noticed that the male was running in a direction and appeared to have several people following behind him.

13.   During the booking process, I observed a white heavy cloth bag, which contained clothing, personal hygiene items and two cellular telephones which were inside of a condom.   In order to ensure that all the parties in custody could account for their property, I asked Romero if the white bag was his.   Romero told to me that the white bag did belong to him.

14.   On March 22, 2012, SA Walker also informed me that he was able to contact the witness, C.M., who placed the other 911 phone call about the boat.   SA Walker told me that C.M. told him the following:

9

a.   C.M. said that she was jogging on a trail between the beach and the power plant when she observed a vessel just off shore.   She said that this vessel looked suspicious in nature. As she was watching the vessel, she saw it run aground on the beach.

b.   Upon landing on the beach, C.M. stated that she first saw three bodies inside of the boat.   Then, as the boat came to shore, she observed multiple people begin to jump out of the vessel.   C.M. said that, based on what she saw, she knew that this boat possibly contained illegal aliens and that she needed to call the police immediately.

c.   At this time, several people riding bikes approached her on the trail.   She asked if one of them had a cell phone she could use to call the police.   One of the parties gave her a cell phone and C.M. placed the 911 phone call.   C.M. added that, during her observations, she remembered seeing approximately two people turn the boat to place the bow of the vessel out to sea, in what appeared to her to be attempt to flee back to open waters.

**Material Witness Interviews**

15.   On March 21, 2012, LA BEST and CBP agents interviewed the twenty aliens at the San Clemente Border Patrol Station. During the interviews, agents and TFOs used a photo array to

identify potential suspects.  The photo array contained photos of all twenty aliens found on the coast that morning.

16.  At approximately 5:57 p.m., material witness Romero Guadalupe Prieto-Placencia, aka "Ramira Prieto-Placencia" ("PRIETO") was interviewed and provided a statement to USBP Agent Alvaro Rodriguez and Supervisory Border Patrol Agent Yvonee Sencio in the Spanish language.  Agent Rodriguez is fluent in the Spanish language and conducted the interview in Spanish.  I reviewed a summary of this interview and learned the following:

a.  PRIETO was born in Guadalajara, Jalisco, Mexico and did not have any immigration documents that would allow him to be or remain in the United States legally.  According to PRIETO, his uncle in Guadalajara made arrangements with an unidentified smuggler for PRIETO to come to the United States by boat for $7,000.  PRIETO stated that his intended destination was Los Angeles, California and added that he was also charged an additional 800 pesos for the use of a life vest during the trip.

b.  PRIETO said that while he was waiting for the trip, the smugglers housed him at the Hotel El in Tijuana, Baja California, Mexico.  On or about March 20, 2012, PRIETO stated that the unknown smuggler sent a "Taxi Libre" to drive him to Ensenada, Baja California, Mexico and drop him off at the "Mercado Negro," which PRIETO described as a park near the Ensenada Harbor where there is a large Mexican flag flying.

11

c.    PRIETO said that, at approximately 7:30 p.m., he and other smuggled aliens boarded a fishing boat in the harbor. PRIETO said that after traveling for about a half hour on the fishing boat, he and the other smuggled aliens were transferred to a panga boat that was waiting for them at sea.  According to PRIETO, this panga was the same panga in which he was apprehended.

d.    PRIETO said that on the panga he heard one of the smugglers, whom he later identified as Romero, talking on a radio.  According to PRIETO, Romero appeared to be attempting to coordinate their panga-landing site with smugglers on shore waiting to pick them up at the beach.  PRIETO further stated that he believed that the panga captain, whom he later identified as Sanchez, was lost because Romero was repeatedly trying to inform the smugglers waiting near the beach about their location. PRIETO said that upon landing on the beach he saw that Romero, Sanchez and another individual, whom he later identified as Guzman, remained behind and were attempting to push the panga away from the beach and back into the water.  PRIETO said that moments later they were all apprehended on the beach.

e.    Agent Rodriguez presented PRIETO with the photo array and PRIETO identified the person depicted in photograph number 17 as the smuggler he observed communicating and

12

coordinating with the smugglers via radio. Photograph number 17 depicts Romero.

f. Using the same photo array, PRIETO identified the person depicted in photograph number 18 as the smuggler he observed acting as the panga captain or driver. Photograph number 18 depicts Sanchez.

g. Using the same photo array, PRIETO identified the person depicted in photograph number 15 as the smuggler he observed stay behind and attempt to push the panga back into the sea. Photograph number 15 depicts Guzman.

h. PRIETO added that he believes that the three defendants know each other well because during the trip, Guzman and Romero sat next to Sanchez on the panga and repeatedly referred to Sanchez as "Capitan" and "Comandante." PRIETO also said that during the trip he was not provided with any food or water and feared for his life because Sanchez was driving the panga very fast in what he considered to be rough water.

17. At approximately 11:34 p.m., material witness Asencion Grajeola-Islas ("GRAJEOLA") was interviewed and provided a statement to USBP Agents Alvaro Rodriguez and Hermenegildo Martinez in the Spanish language. I reviewed a summary of this interview and learned the following:

a. GRAJEOLA stated that he is a Mexican citizen, he was born in Nayarit, Mexico and that he did not have any

13

immigration documents that would allow him to be or remain in the United States legally. GRAJEOLA said he made arrangements with a smuggler called Carlos for transportation to the United States for $8,000. GRAJEOLA stated that his intended destination was Los Angeles, California.

b.    GRAJEOLA said he stayed with his family in Tijuana Baja California, Mexico waiting for Carlos to call him. On March 20, 2012, GRAJEOLA said he took a bus to Ensenada and then a taxi to a park near the Ensenada Harbor where there is a large Mexican flag flying.

c.    GRAJEOLA said that at approximately 7:30 p.m., he and the other smuggled aliens boarded a fishing boat in the harbor. According to GRAJEOLA, after traveling for about a half hour, he and the rest of the smuggled aliens were transferred to a panga that was waiting at sea. GRAJEOLA stated that the panga was the same panga in which he was apprehended.

d.    GRAJEOLA said that during the panga trip, he heard someone on the back of the panga say that they missed their landing spot. GRAJEOLA said he heard them say that they were supposed to land in Long Beach or San Pedro. According to GRAJEOLA, he heard a radio conversation between the smugglers and someone on shore asking the smugglers where they were because the waiting smugglers onshore could not see them. GRAJEOLA said the boat driver decided to land the boat anyway.

14

e.   GRAJEOLA said that, upon landing on the beach, he saw someone he later identified as Romero giving everyone instruction about where to go.  According to GRAJEOLA, Romero was also asking smuggled aliens to help push the panga back into the water.  Moments later they were all apprehended on the beach.

f.   Agent Rodriguez presented GRAJEOLA with the photo array.  GRAJEOLA identified the person depicted in photograph number 17 as the smuggler he observed giving orders at the beach and the person asking for help pushing the panga back into the water.  Photograph number 17 depicts Romero.

g.   Using the same photo array, GRAJEOLA identified the person depicted in photograph number 15 as the smuggler he observed acting as the panga captain or driver.  Photograph number 15 depicts Guzman.

h.   Using the same photo array, GRAJEOLA identified the person depicted in photograph number 18 as the smuggler he observed next to the panga driver.  Photograph number 18 depicts Sanchez.

i.   GRAJEOLA added that during the trip he was not provided with any food or water and feared for his life.

18.  At approximately 1:33 p.m., material witness Leticia Castillo-Santoyo ("CASTILLO") was interviewed and provided a statement to Agent Martinez and Special Agent Simons in the Spanish language.  I reviewed a summary of this interview and

15

learned the following:

a. CASTILLO is a Mexican citizen who was born in Oaxaca, Mexico and now resides in Ensenada. CASTILLO stated that she does not have any immigration documents that would allow her to be or remain in the United States legally. Her husband, who lives in Palmdale, CA, made arrangements with a smuggler to have her smuggled via Panga boat into the United States for $7,000. Her husband also paid the smugglers 1,000 pesos for her costs during the trip, including fuel and a life jacket. During the interview, she provided agents with telephone number for her husband. Agents called her husband and allowed her to speak with him. Her husband confirmed making the smuggling arrangement with an individual known as "Nene" to bring her to Los Angeles for $7,000.

b. On March 20, 2012, CASTILLO said that she and three males were taken by an unidentified man to the Ensenada Harbor where the "big flag" is. There, they were told to board a fishing boat, captained by an unknown individual. CASTILLO said that the fishing boat traveled for approximately 15 minutes out into the ocean before she and the other aliens were transferred from the fishing boat to the Panga boat. CASTILLO said that they traveled on the panga boat throughout the night until they landed on the beach in El Segundo. CASTILLO claimed that she and the other three females on the Panga boat sat in the section directly

16

in front of the boat's steering column and that she sat directly in front of the Captain. CASTILLO claimed that she was provided with the life jacket she had paid for, but the smugglers never provided her or the other aliens with any food or water during the trip. CASTILLO stated that when they landed on the beach, she and the other smuggled aliens followed their guide, who was carrying a white duffel style bag in his hand.

     c. CASTILLO was presented with the photo array, but she did not positively identify anyone as one of the smugglers. CASTILLO pointed to the person depicted in photograph number 17 and identified him as a possible smuggler and then changed her answer by pointing to the person depicted in photograph number 19 and stated that she was not sure. CASTILLO stated that she was told to look forward for the entire trip and did get a very good look at the smugglers. Photograph number 17 depicts Romero. Photograph number 19 depicts material witness Alfonso Puentes-Mora.

     19. At approximately 5:54 p.m., material witness Marlon Lopez-Castro, aka "Manuel Renderos Comayagua" ("RENDEROS") was interviewed and provided a statement to USBP Agents Joel Lopez and Julian Velardes in the Spanish language. I reviewed a summary of this interview and learned the following:

     a. RENDEROS stated that he was a citizen of El Salvador and admitted that he did not possess any immigration

documents that would allow him to be, or remain, in the United States legally.   RENDEROS stated he was previously deported after being arrested for domestic violence.

      b.   RENDEROS said that he made arrangements to be smuggled into the United States via panga for $8,000, which he was to pay after he arrived in the United States.   RENDEROS said he was picked up by an unknown man in Tijuana and transported to Ensenada where, at approximately 7:30 P.M., he boarded a boat. RENDEROS stated the boat drove for approximately 40 minutes west and then he and the other aliens were told to board a panga. RENDEROS said that it was the same panga in which he and the other aliens landed in the United States.

      c.   RENDEROS said he believes the smugglers were lost because when they landed they had to wait for the load driver. As they waited they were apprehended by law enforcement.

      d.   RENDEROS was presented with the photo array.   He identified the person depicted in photograph number 18 as the panga "Navigator".   Photograph number 18 depicts Sanchez.

      e.   Using the same photo array, RENDEROS identified the person depicted in photograph number 14 as a person who he saw talking to number 18.   Photograph number 14 depicts material witness Joel Ruiz-Perez.

18

## Interview with Sanchez

20. At approximately 8:53 p.m., Sanchez was interviewed and advised of his Miranda rights by USBP Agents Lopez and Velardes in the Spanish language. Sanchez stated that he understood his rights, waived his Miranda rights, and elected to make a statement without an attorney present. I reviewed a summary of this interview and learned the following:

a. Sanchez stated that he was a Mexican citizen who was born in Nayarit, Mexico and admitted that he did not possess any immigration documents that would allow him to be, or remain, in the United States legally.

b. When questioned about the smuggling event, Sanchez initially claimed that he was a smuggled alien and that he agreed to pay the smugglers $8,000 after he arrived in the United States. Sanchez claimed that he traveled to Tijuana on March 19 where he met a smuggler named "El Pina" who drove him to the Ensenada Harbor in Ensenada where he waited from approximately 4:00 p.m. until 8:00 p.m. to get on a boat. Sanchez then claimed that the smuggling boat did not depart so he stayed in an unknown hotel in Ensenada until the next day when "El Pina" picked him up and took him to the boat. However, when confronted with the facts of the case and told that his story was implausible, Sanchez admitted that he had been lying to the Agents and agreed to tell the truth.

19

      c.    Sanchez admitted that he was driving the boat.
Sanchez described himself as "poor" and stated that he was a
"fisherman" from Nayarit who needed the money.  Sanchez claimed
that he was approached by a smuggler named "La Leche" near La
Pinita Beach in Nayarit and told that he can make money smuggling
people by boat to the United States.  Sanchez stated that "La
Leche" instructed him to travel to Ensenada where he was
introduced to "El Chilango," whom he described as a "fat"
Hispanic male approximately 30 years old.  Sanchez stated that he
was to be paid $200 per person to captain the panga to the United
States.  Sanchez said that "El Chilango" provided him with a GPS
prior to the smuggling event.  Sanchez claimed that he was
instructed to take the panga on a route to the west of Santa
Catalina Island and once past the Island he was instructed to
drive toward the mainland.  Sanchez said that he departed from
Ensenada at approximately 8:00 p.m. and approximately 5
kilometers off shore met with another panga to load approximately
18 - 20 fuel containers on board.  Sanchez then said that he then
met with a third, larger boat off shore where he picked up the
smuggled aliens.  Sanchez stated that he then began traveling
north and was due to arrive in the Los Angeles area at
approximately 3:00 a.m. or 4:00 a.m. where unknown smugglers
would be waiting for them.

d.    Sanchez was presented with the photo array and he
identified the person depicted in photograph number 17 as the
panga "Co-Captain" and "Foot Guide."  Photograph number 17
depicts Romero. According to Sanchez, Romero left with Sanchez on
the panga from the harbor and he was to guide the smuggled aliens
to the vehicle once they landed on shore.

e.    Using the same photo array, Sanchez identified the
person depicted in photograph number 15 as the "Navigator" and a
person who he knows from Nayarit.  Photograph number 15 depicts
Guzman.  According to Sanchez, Guzman arrived on the panga with
the smuggled aliens and was working the GPS during the panga
trip.

**Interview with Romero**

21.  At approximately 7:30 p.m., Romero was interviewed and
advised of his Miranda rights by Agents Martinez and Manuel
Aguirre in the Spanish language.  Romero stated that he
understood his rights, waived his Miranda rights, and elected to
make a statement without an attorney present regarding the
smuggling event. I reviewed a summary of this interview and
learned the following:

a.    Romero said he was a Mexican citizen who was born
in Mazatlan, Sinaloa, Mexico.  Romero admitted that he did not
possess any immigration documents that would allow him to be, or
remain, in the United States legally.  Romero said that he

21

currently resides in Tijuana with his wife and four minor children where he is employed as a taxi driver.

        b.    When questioned about the smuggling event, Romero initially claimed that he was approached by an unidentified smuggler in Tijuana and that he paid the smuggler $3,000 for the trip. According to Romero, he was taken by bus to a beach in Baja California where he boarded a panga "loaded" with people and began traveling north. Romero claimed that the panga traveled all night until morning when they were arrested. Romero stated that he did not care where the panga landed because he wanted an "adventure". However, when confronted with the facts of the case, Romero recanted his initial statement and stated that he had previously lied to investigators because "he thought he could get away with it".

        c.    Romero admitted that he "was involved" in the smuggling event. Romero said that he was picked up by the panga at a beach in Popotla, Baja California and that he was to serve as the group's foot guide. Romero said that his specific duties were to keep in telephone contact with an unknown smuggler in Mexico and, once the panga landed along the California coast, he was supposed to guide the smuggled aliens to a waiting Ford Expedition. Romero claimed that for his service he was to receive a $3,000 discount from his $6,000 smuggling fee.

d.   Romero was presented with a photo array and he identified the person depicted in photograph number 18 as the panga "captain."  Photograph number 18 depicts Sanchez.

e.   Romero was presented with the same photo array and he identified the person depicted in photograph number 15 as the "Navigator."  Photograph number 15 depicts Guzman.

**Interview with Guzman**

22.  At approximately 10:25 p.m., Guzman was interviewed and advised of his <u>Miranda</u> rights by Agents Lopez and Velardes in the Spanish language.  Guzman stated that he understood his rights, waived his <u>Miranda</u> rights, and elected to make a statement without an attorney present regarding the smuggling event.  I reviewed a summary of this interview and learned the following:

a.   Guzman stated that he was a Mexican citizen who was born in Nayarit, Mexico.  Guzman also admitted that he did not possess any immigration documents that would allow him to be, or remain, in the United States legally.  Guzman said that he currently resides in Tijuana.

b.   When questioned about the smuggling event, Guzman initially claimed that he was approached by an unidentified smuggler in Nayarit who offered him an opportunity to come to the United States at a discounted price in exchange for his help. Guzman claims that he was asked to do this because of his experience as a fisherman in Nayarit.  Guzman claims that he was

23

told that he would be smuggling a group of people into the United States by boat and that his job would be to help the people aboard when asked to do so by other members of the smuggling group. Guzman said that he was only going to be charged $200 dollars as a smuggling fee in exchange for his services.

c.   Guzman traveled to Tijuana where he established a residence in "Colonia Maria Matamoros." Guzman claimed that he had been living there for approximately one month before he received a call from an unknown smuggler advising him that his services would be needed. Guzman was told to travel to Ensenada to await further instruction. Guzman claimed that he never met the smuggler in person and all communication was telephonic.

d.   Guzman said that he was told to go to the harbor in Ensenada where he boarded a tourist-type boat, which he described as more luxurious than a panga. Guzman stated that all the people were arrested with him today were aboard the vessel when they departed. Guzman stated that they made their way out of the harbor and were met by a panga boat out in the ocean. They were told to leave the bigger vessel and climb onboard the panga.

e.   Guzman stated that he operated a Global Positioning System Device (GPS) while on the panga. He also mentioned that when the panga's fuel was low, he would assist in the refueling. Guzman said they passed approximately 3 miles

24

west the Coronado Islands at about 10 p.m. Guzman then said that they passed approximately two miles west of Catalina Island at approximately 3 a.m. or 4 a.m.

f. Guzman was presented with the photo array and he identified the person depicted in photograph number 18 as the panga "Choffer" (Driver). Photograph number 18 depicts defendant Sanchez.

g. Guzman was presented with the same photo array and he identified the person depicted in photograph number 17 as the person who was operating the radio and was in communication with the subjects who were supposed to pick them up once in the United States. Photograph number 17 depicts Romero.

CONCLUSION

20. Based upon the foregoing facts and my training and experience, I believe that there are sufficient facts to establish that material witnesses LETICIA CASTILLO-SANTOYO, SU HANG LEE, aka "Su Fen Xu," MARIANA MEDRONO-GONZALEZ, MARTA FUENTES-RAMIREZ, OSWALDO BELTRAN-ESCALANTE, ABEL PENA-SIVA, aka "Fernando Zaragoza-Torres," ROMERO GUADALUPE PRIETO-PLASCENCIA, aka "Ramiro Prieto-Placencia," ASENCION GRAJEOLA-ISLAS, RUBEN RAMOS-MUNIZ, ALBERTO RANGEL-VALENCIA, RICARDO RODRIGUEZ-MANZO, aka "Jose Arias-Avalos," MARLON LOPEZ-CASTRO, "Manuel Renderos-Comayagua," JOEL RUIZ-PEREZ, NORBERTO ANTONEZ-NORA, ALFONSO PUENTES-MORA, JOSE LUIS DENIS ROSALEZ's testimony is material in

25

a criminal proceeding and that they should be designated and detained as material witnesses pursuant to 18 U.S.C. § 3144.

_____
Jeffrey S. Bosket
Task Force Officer
Homeland Security Investigations /
Immigration and Customs Enforcement

Sworn to the subscribed before me
this 23rd day of March 2012

_____
United States Magistrate Judge

26